**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* <br><br> FLEMING INTERNATIONAL REINSURANCE LTD., <br><br> Debtor in Foreign Proceeding.[1] | Chapter 15 <br><br> Case No. 25-12353 (JPM) |

**DECLARATION OF ERIC HALLER IN SUPPORT OF (I) THE VERIFIED PETITION, (II) MOTION FOR ENTRY OF ORDERS GRANTING (A) EMERGENCY *EX PARTE* RELIEF AND (B) PROVISIONAL RELIEF, PURSUANT TO BANKRUPTCY CODE SECTION 1519, AND (III) THE SCHEDULING MOTION**

Pursuant to 28 U.S.C. § 1746, I, Eric Haller, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "**Declaration**"). I am making this Declaration in accordance with section 1515 of title 11 of the United States Code (the "**Bankruptcy Code**") and rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2. I am the Chief Executive Officer and a director of the Fleming Group (defined below). I have more than 25 years' experience with runoff merger-and-acquisition transactions, strategic planning, operations, and financial reporting. I have held senior roles with international insurers/reinsurers with experience in traditional reinsurance, legacy reinsurance, life and annuity, and other disciplines.

---

[1] The Debtor is a Bermuda company registered with the Registrar of Companies in Bermuda. The Debtor's registration number is 41041. The Debtor has its registered office located at Clarendon House, 2 Church Street, Hamilton HM11, Bermuda.

3. On October 20, 2025, the Debtor commenced the Bermuda Proceeding by filing the Winding-Up Petition with the Bermuda Court seeking, among other things, the appointment of the JPLs as joint and several "light-touch" provisional liquidators of the Debtor.

4. On October 21, 2025, the Bermuda Court issued the JPL Appointment Order appointing Simon Appell, Daniel Imison, and Mathew Clingerman as the JPLs in the Debtor's provisional liquidation proceeding currently pending before the Supreme Court of Bermuda (the "**Bermuda Court**"), under Part XIII of the Companies Act 1981 (as amended, the "**Bermuda Companies Act**"), Companies (Winding Up) Commercial Court, 2025: No. 270 (the "**Bermuda Proceeding**"). A copy of the order evidencing the appointment of the JPLs (the "**JPL Appointment Order**") is attached to the Debtor's official form petition filed substantially concurrently herewith (collectively, the "**Chapter 15 Petitions**") as Exhibit B thereto. The *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Certain Related Relief* (the "**Verified Petition**")[2] seeks recognition of the Bermuda Proceeding under chapter 15 of the Bankruptcy Code.

5. I submit this Declaration in support of the (a) Verified Petition; and the (b) *Motion for Entry of Orders Granting (I) Emergency Ex Parte Relief and (II) Provisional Relief, Pursuant to Bankruptcy Code Section 1519* (the "**Provisional Relief Motion**"); and the (c) *Motion for Entry of an Order (I) Scheduling Recognition Hearing and (II) Specifying Form and Manner of Service of Notice of the Notice Documents and Other Documents Filed in the Chapter 15 Case*, filed substantially concurrently herewith.

6. Consistent with my role as chief executive officer of the Fleming Group, including the Debtor, I have gained knowledge of the Debtor's history, day-to-day operations, assets,

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

2

financial condition, business affairs, and books and records. I am over the age of 18 and, except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge; (b) my review of relevant documents, including documents prepared or filed in connection with the Bermuda Proceeding and the above-captioned chapter 15 case (the "**Chapter 15 Case**"); (c) information supplied to me by the officers, directors, employees, or professionals retained by the Debtor; or (d) my experience and knowledge of the Debtor's assets and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

7. The JPL Appointment Order appointed the JPLs as the Debtor's authorized foreign representatives, including for the purpose of chapter 15 under the Bankruptcy Code, and authorized the JPLs, "if deemed necessary or appropriate, or both, by the JPLs, to apply to any foreign court (wherever situated) for recognition of their appointment or in connection with any other proceedings to take advantage of any insolvency or bankruptcy protection that such foreign law, procedures, or proceedings may provide" to the Debtor. JPL Appointment Order ¶ 1(h).

8. The JPL Appointment Order vests the JPLs with certain powers and duties as set out in the order, including:

(a) to review the financial position of the [Debtor];

(b) to monitor the continuation of the business of the [Debtor] by the existing board of directors of the [Debtor] (the "**Board**");

(c) to consult with the creditors and policyholders of the [Debtor] in determining the most appropriate manner to preserve and/or realise value for the benefit of the creditors and policyholders including exploring and developing potential restructuring proposals and/or assessing the feasibility of the same;

(d)     after consultation with the Board, to take such steps as the JPLs deem appropriate to sell, transfer, dispose, or otherwise restructure the [Debtor's] assets including the implementation of any restructuring proposal;

(e)     to sign off on or execute agreements (including any documents to facilitate the sale, transfer, or disposition of some or all of the [Debtor's] assets or the implementation of any restructuring proposal), pleadings, or any other document on behalf of the [Debtor] (with such court sanction as the JPLs may consider necessary or appropriate, or both, in the circumstances); and

(f)     to seek recognition of the provisional liquidation or the appointment of the JPLs, or both, in any jurisdiction the JPLs consider necessary or appropriate, or both, together which such other relief the JPLs may consider necessary or appropriate, or both, for the proper exercise of their functions within those jurisdictions, and to make applications to the court(s) of such jurisdiction for that purpose. JPL Appointment Order ¶ 1.

9.      The recent appointment of the JPLs is intended to provide independent oversight and stability to the Debtor and give the JPLs and the Debtor a breathing space to determine the best path forward. This includes consideration of a possible restructuring of the Debtor's assets and liabilities. As such, the JPLs require sufficient time and a stable environment to assess the Debtor's affairs and to formulate an appropriate strategy to maximize value for all stakeholders.

10.     Despite having commenced the Bermuda Proceeding in Bermuda, which put in place a stay against creditor and other stakeholder actions in Bermuda to the extent provided for in Bermuda law, the Debtor remains vulnerable to adverse creditor and other stakeholder actions in the United States.

4

11. The Debtor is particularly concerned that the Ceding Insurers (as defined below), as counterparties to certain agreements (the "**Reinsurance Trust Agreements**") and underlying contracts, may assert or attempt to exercise rights to withdraw or otherwise access funds held in U.S. accounts for which the Debtor is a grantor and retains, at the least, a reversionary interest. If such parties were to take unilateral action to access or dissipate these assets, it could significantly undermine the orderly administration of the Debtor's estate, risk the success of the Bermuda Proceeding, and result in a race to enforce on the Debtor's assets, to the detriment of the Debtor's and JPLs' ability to maximize the value for the benefit of all stakeholders.

## BACKGROUND

12. A description of the Debtor's business, an overview of the Debtor and the events leading up to the commencement of the Bermuda Proceeding and the Chapter 15 Case is included in the Verified Petition. Set forth below is additional information regarding the Debtor's business and certain arrangements it has with key counterparties as relevant to the Provisional Relief Motion.

## THE CHAPTER 15 CASE

**I.     The Debtor and Its Group Structure**

13. The Debtor is an exempted company incorporated under the Bermuda Companies Act. It was previously known as JRG Reinsurance Company, Ltd. ("**JRG Re**").

14. The Debtor is a Class 3B insurer registered pursuant to the Bermuda Insurance Act 1978 (the "**Insurance Act**"). It is the wholly owned subsidiary of Jaguar Holdings LLC ("**Jaguar**"), a limited liability company ("**LLC**") registered in Bermuda. Jaguar is itself the wholly owned subsidiary of Fleming Intermediate Holdings LLC ("**FIH**"), which is an LLC registered in

5

the Cayman Islands. Jaguar is currently the subject of a pending involuntary winding-up petition under the Bermuda Companies Act brought by its primary lender.

15. FIH, its direct parent and certain of its indirect parent entities are collectively referred to herein as the "**Fleming Group**" or "**Fleming**" unless otherwise indicated.

## II.  The Debtor's Business Operations

16. The Fleming Group's principal reinsurance activities are conducted via its two regulated entities, Fleming Reinsurance Ltd., a Bermuda segregated accounts company organized under and pursuant to the Segregated Accounts Companies Act 2000, and the Debtor.

17. The Debtor's primary business consists of acting as an assuming reinsurer of reinsurance business ceded to it by approximately 50 ceding insurance companies ("**Ceding Insurers**" and the Debtor's arrangements with them, the "**Cedant Contracts**").

18. The Debtor's Certificate of Registration prevents it from writing any "insurance business" as defined by the Insurance Act. The Debtor is permitted under its license and applicable regulatory guidance only to write retroactive reinsurance. In essence, the Debtor covers the Ceding Insurers' already-incurred liabilities mostly in relation to long-tail lines (where claims are typically reported and paid out over an extended period) in the casualty space through structures such as, for example, loss portfolio transfers ("**LPTs**"). By so taking on prior liabilities, rather than future exposure, the Debtor offers the Ceding Insurers balance sheet relief, capital efficiency, and claims finality or partial finality.

19. With respect to minimizing the risk of financial loss, most of the Ceding Insurers' significant Cedant Contracts ceded to the Debtor are supported and collateralised by what are generally known as Regulation 114 trusts. This refers to a reinsurance collateral trust that meets the requirements of New York Insurance Department Regulation 114 (and aligned with applicable NAIC model provisions) (a "**Trust Account**" and together, the "**Trust Accounts**"), which allows

6

the Ceding Insurers to receive statutory credit for reinsurance placed with, in this case, a Bermuda reinsurer, with whom some of the risk is shared. There is therefore significant interplay between the underlying Cedant Contracts and each Reinsurance Trust Agreement to which the relevant Cedant Contract relates. Under each of the Reinsurance Trust Agreements, collateral is held in the relevant Trust Account, administered by the relevant trustee. Interest accrues on the collateral held in each Trust Account, accruing in favor of the Debtor.

### III.    Events Leading to the Chapter 15 Case

#### A.    The Stock Purchase Agreement

20.     On November 8, 2023, FIH entered into a Stock Purchase Agreement ("**SPA**") with James River Group Holdings, Ltd. ("**James River**") to purchase the shares of JRG Re.

21.     On or about February 26, 2024, prior to the SPA's closing, JRG Re made distributions to James River in the aggregate amount of $139 million, representing both a return of capital and dividends (the "**Distributions**").

22.     Prior to the SPA closing, FIH raised concerns about the Distributions and eventually, because of its concerns, FIH determined that it would not continue with the acquisition of JRG Re.  However, James River sought and obtained an order of the Supreme Court of the State of New York compelling FIH to close the transactions contemplated by the SPA. Following the closing of the SPA, JRG Re was renamed as the Debtor.

### IV.    The Debtor's Financial Position

23.     Since the closing of the SPA, the Debtor's financial condition has been challenged, principally because of the effects of (i) the Distributions and (ii) the enforcement of collateral escalation obligations, as further set forth below.

### A. The Distributions

24. The capital outflow from the Distributions adversely affected the Debtor's financial position. The Distributions substantially constrained the Debtor's liquidity to pay its liabilities as they became due. The JPLs and the Debtor reserve all rights and claims with respect to the Distributions, including to pursue property related thereto within the territorial jurisdiction of the United States.

### B. Collateral Escalation Obligations

25. Before execution of the SPA, Fleming learned that a substantial majority of the Ceding Insurer's agreements included collateral escalation clauses. In general, such provisions require the reinsurer to post additional collateral if certain circumstances are triggered. Fleming also learned that in December 2023, after the signing of the SPA but before the closing, a triggering event under a Ceding Insurer's collateral escalation clause occurred but no additional collateral was provided at that time. After the SPA's closing, the Debtor became obligated to comply with the enhanced collateral requirement. The Debtor has provided some increase to the collateral and agreed with the Ceding Insurer that, instead of releasing excess collateral to the Debtor (as would typically occur in the ordinary course as the underlying liabilities amortized), the Ceding Insurer would retain any excess collateral on the conditions stated in such agreement. This arrangement has deprived the Debtor of much needed liquidity and resulted in substantial economic loss. The Ceding Insurer continues to allege that it is not fully collateralized under the terms of its collateral escalation clause.

### C. Efforts to Resolve the Debtor's Liquidity Problems

26. From the closing of the JRG Re acquisition, management has focused extensively on resolving the foregoing liquidity issues and has been in ongoing discussions with certain of its Ceding Insurers. However, the Debtor is currently unable to pay its debts. Further, on October 16,

2025, the primary creditor of Jaguar, the Debtor's immediate holding company, filed an involuntary winding-up petition in Bermuda against Jaguar.

## V. The Cedant Contracts

27.     Under the majority of the Cedant Contracts, the Ceding Insurers may seek to terminate such contracts if, among other things, the Debtor becomes, is found to be, or is declared insolvent by a relevant insurance regulatory agency or court of competent jurisdiction, or enters or is placed into liquidation, in each case either immediately upon written notice or, in the case of some Cedant Contracts, by prior written notice to the Debtor.

## VI. The Reinsurance Trust Agreements

28.     Under the Reinsurance Trust Agreements, the Ceding Insurers and the Debtor may terminate by, among other things, providing written notice to the other and/or the trustee of their intention to terminate such Reinsurance Trust Agreement or the relevant Trust Account.

29.     Ceding Insurers are also allowed to draw down funds from the Trust Accounts in accordance with the terms of the Reinsurance Trust Agreements and the Cedant Contracts. The Ceding Insurers may take the position that certain of the Reinsurance Trust Agreements allow them to withdraw any and all assets and/or amounts from the Trust Accounts without providing notice to, or obtaining the consent of, the Debtor.

## VII. Potential Adverse Consequences

30.     A cascade of unfortunate consequences might now ensue as a result, under both the Cedant Contracts and the Reinsurance Trust Agreements, if the Ceding Insurers attempt to terminate the Cedant Contracts and/or withdraw cash under the Reinsurance Trust Agreements. Ceding Insurers taking such actions would likely amount to a breach under the Cedant Contracts and/or the Reinsurance Trust Agreements, to the detriment of the Debtor and its creditors.

31. As noted, under the majority of the Cedant Contracts, the Ceding Insurers may claim to have the ability to terminate the relevant Cedant Contract, or exercise other remedies. The effect of termination varies under the Cedant Contracts. In many instances, the Ceding Insurers may claim to have the ability to terminate a Cedant Contract (i) on a 'cut-off' basis, the effect of such termination being that an amount is owing from the Debtor to the relevant Ceding Insurer; or (ii) on a 'run-off' basis, where the obligations under the Cedant Contract continue. In either circumstance, any such termination will cause significant disruption and damage to the Debtor's business.

32. As also noted, in certain cases the Ceding Insurers may also claim that the Reinsurance Trust Agreements allow them to withdraw any and all assets and/or amounts from the Trust Accounts without providing notice to, or obtaining the consent of, the Debtor. While all of the Reinsurance Trust Agreements specify the purposes for which the Ceding Insurers may use the assets and/or amounts withdrawn from the Trust Accounts, there is a strong possibility that the Ceding Insurers, on or shortly after becoming aware of the Bermuda Proceeding, may seek to withdraw assets and/or amounts from the Trust Accounts and hold such assets/amounts, purporting to apply the assets/amounts in accordance with the terms of the underlying Cedant Contract. The relevant Cedant Insurer might seek to withdraw over-collateralized assets/amounts from the Trust Account while a final payment amount is being determined, which means that the relevant Ceding Insurer, rather than an independent trustee with a segregated account, would be holding cash that ultimately may revert to the Debtor. As mentioned above, any such drawdown would likely amount to a breach of the Reinsurance Trust Agreements.

33. While I understand from the Taylor Declaration that the Bermuda Proceeding has invoked a stay with regard to assets in Bermuda to the extent provided for in Bermuda law (Taylor

Decl. ¶ 30), the Debtor has assets in the United States, including funds in the Trust Account and rights under related agreements governed by U.S. law, that while of great importance to the success of the Bermuda Proceeding are not effectively protected by the Bermuda stay.

34. In short, absent a stay in the United States, Ceding Insurers may assert or attempt to exercise rights to withdraw or otherwise access funds held in accounts for which the Debtor, at a minimum, retains a reversionary interest, thus enabling such creditors to use self-help to short-circuit the orderly process of the Bermuda Proceeding and hold cash in their own (potentially non-segregated) accounts. They may also take actions resulting in the termination of critical contracts.

35. I understand that the JPLs commenced the Chapter 15 Case to provide the Debtor and JPLs the breathing room necessary to maximize the value of the Debtor's assets and business in the most efficient, orderly, and economical manner possible, consistent with the JPLs' role to ascertain, oversee and preserve the Debtor's assets for the benefit of all stakeholders.

36. I am extremely concerned about the risk that the Cedant Insurers and other creditors may seek to assert rights, or take enforcement action against the Debtor's assets within the United States, or otherwise interfere with the Debtor's and JPLs' efforts in furtherance of the Bermuda Proceeding and the JPL Appointment Order. I therefore believe that the Debtor faces immediate and irreparable harm if the requested injunctive relief is not granted and that such injunction is necessary to protect the status quo pending this Court's decision on recognition of the Bermuda Proceeding.

37. Without the relief requested in the Provisional Relief Motion, the Debtor and its assets in the United States could be exposed to adverse action by creditors and other parties in interest, including the Ceding Insurers, who may seek to take actions or exercise rights that they claim that they have under the Cedant Contracts and the Reinsurance Trust Agreements, including

asserting or attempting to exercise rights to withdraw or otherwise access funds held in the Trust Accounts.

38. The Debtor requires protection from adverse creditor actions that could, at a minimum, decrease the amount of funds available to distribution, and, at worst, undermine the Bermuda Proceeding.

39. Specifically, the taking of actions by any Ceding Insurer would further destabilize the Fleming Group, in particular the Debtor, causing irreparable harm during this critical period in which the JPLs and the Debtor are taking steps to engage with the Debtor's creditors with a view to developing the terms of a proposed restructuring of the Debtor's financial indebtedness. After-the-fact attempts to recover withdrawn assets/amounts from Ceding Insurers as described above by the Debtor or JPLs will add unnecessary cost and complexity down the line, will be an unnecessary distraction while the Debtor and JPLs develop a restructuring proposal, and could undermine or put at risk the success of the Bermuda Proceeding.

40. Immediate application of the requested stay to the assets, operations, and contractual rights of the Debtor within the United States is necessary further to allow the JPLs, who were only recently appointed, breathing room to focus on fulfilling their duties and responsibilities in the Bermuda Proceeding and achieving the most beneficial outcome for the Debtor's stakeholders.

41. The Requested Relief will thus avoid piecemeal distribution and depletion of the Debtor's assets and attendant inequitable distribution of property among claimholders.

42. I understand that any creditor will remain free to petition this Court for relief from the stay, for cause.

43. I further understand that the Ceding Insurers and other affected parties will have the opportunity to participate in the Bermuda Proceeding and make any reasonable arguments with respect to their rights therein.

44. Therefore, I do not believe the relief requested will unduly prejudice them.

**WHEREFORE**, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: Hamilton, Bermuda
October 26, 2025

*/s/ Eric Haller*
Eric Haller